# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **STEVE RIDDICK,** | ) | |
| **Plaintiff,** | ) | **Civil Action No. 7:20cv00560** |
| | ) | <u>**MEMORANDUM ORDER**</u> |
| **v.** | ) | |
| | ) | **By: Hon. Pamela Meade Sargent** |
| **C/O K. MOORE, et al.,** | ) | **United States Magistrate Judge** |
| **Defendants.** | ) | |
| | ) | |

This matter is before the court on the pro se plaintiff's motion for spoliation, (Docket Item No. 36) ("Motion"). An evidentiary hearing was held on the Motion on April 7, 2022.  Based on the evidence and arguments presented by the parties, the Motion is **GRANTED in part** for the reasons set out below.


*I.  Facts*


In this 42 U.S.C. § 1983 action, the plaintiff, Steve Riddick, ("Riddick"), a Virginia Department of Corrections, ("VDOC"), inmate incarcerated in Red Onion State Prison, ("Red Onion"), claims that Correctional Officer K. Moore, ("Moore"), used excessive force against him on September 21, 2019, as she escorted Riddick to and from a psychiatric physical and then retaliated against him, in violation of his First and Fourteenth Amendment rights, by placing a fabricated disciplinary charge against him on September 22, 2019. Riddick also claims that the Hearings Officer, Larry Mullins, ("Mullins"), Warden Jeffrey Kiser, ("Kiser"), and Regional Administrator, Carl Manis, ("Manis"), violated his due process rights under the Fourteenth Amendment, by convicting him and/or upholding his convictions to the

fabricated charge. The Motion seeks the entry of summary judgment in Riddick's favor as a sanction against the defendants for failing to preserve surveillance video recordings, which Riddick requested be preserved as evidence in this case.

Riddick testified at the April 7 hearing that he was a VDOC inmate who has been housed at Red Onion since 2011. He said that, on September 21, 2019, he was housed in a segregation or the restrictive housing unit in the C2 Building in cell 207 on the lower tier. Riddick testified that inmates held in restrictive housing at Red Onion were restrained whenever they were removed from their cells. He said that, on September 21, 2019, at about 9:30 a.m., Moore placed him in restraints to escort him to a psychiatric appointment inside the C2 Building. In doing so, Moore put the leg irons on him too tightly before removing him from his cell. Riddick said that he complained to Moore and Correctional Officer E. Shirks that the leg irons were too tight and were cutting into his skin. He said he stopped, and Shirks looked at the leg irons, but he did not adjust them. Riddick said when he arrived at his appointment, he asked the nurse, Nurse Charles, to look at his leg irons. He said the leg irons were so tight that Nurse Charles had to force her finger underneath the leg irons.

When Moore escorted him back to his cell, Riddick said, he knelt down to have his leg irons removed, and Shirks removed his leg irons. Riddick said that he knelt down before being told to do so because he knew the required routine. After his leg irons were removed, Riddick said that Moore took both of her hands and shoved him on his shoulders, pushing him forward. He said that he did not, however, hit the floor.

Riddick said that when he returned to his cell, the cell door was open. When he knelt down to have his leg irons removed, he was required to have his feet and a

portion of his legs outside of the cell across a yellow line. He said his knees and his body were inside of the cell when he knelt down. Riddick said that there was a surveillance camera on the wall almost directly across from his cell, so he believed the camera would have been able to record what occurred just inside of his cell door. Riddick stated that the view of his cell would not have been blocked by the stairs to the top tier. Riddick said that, as he knelt down, Moore told him to "make a move," which he interpreted to mean for him to do something to give Moore a reason to use force against him. He also said that Moore used profanity and called him a "bitch" when she removed him from his cell that day.

Riddick said that he filed Informal Complaint No. ROSP-19-INF-01891 a couple of days later, complaining of Moore's action. Riddick testified that he dated the form September 22, 2019, but he did not believe he submitted it until September 29, 2019, because the form read at the top "Put in the mail on 9-29."[1] Informal Complaint No. ROSP-19-INF-01891 was admitted into evidence as part of Plaintiff's Exhibit No. 1. (Docket Item No. 69-1 at 5.) On this Informal Complaint, Riddick wrote in the section where it asked him to briefly explain the nature of his complaint:

> K. Moore refused my psych physical & didn't ask me did I want it. Nurse Craft later did it & before she did, Moore yelled through the side of my cell door, put your shit in the box bitch & strip. She put leg irons on around my shins tightly cutting into my shins. As Craft was getting my blood pressure, Moore yelled in my left ear. Called me a bitch. As C/O E. Shirks was removing the leg irons, Moore forcefully pressed down on my shoulders & called me a nigger & said I'd move where the fuck she told me to move.

---

[1] This notation is only partially visible on the copy of the Informal Complaint submitted into evidence.

(Docket Item No. 69-1 at 5.) Riddick also wrote on the Informal Complaint, "I want this incident viewed on camera." (Docket Item No. 69-1 at 5.)

It was noted that this Informal Complaint was received on October 1, 2019. On October 4, 2019, Sgt. Taylor responded: "This incident has been reviewed and no merit found in your statements. Appropriate video has been saved." (Docket Item No. 69-1 at 5.) Riddick testified that, in addition to receiving this statement that the video evidence had been saved, he also sent "intel" a request form, requesting that the video be saved. Riddick did not, however, bring a copy of that request form to be admitted into evidence.

Riddick said he also filed Regular Grievance ROSP-19-REG-00431 concerning this incident. This Regular Grievance was admitted into evidence as part of Plaintiff's Exhibit No. 1. (Docket Item No. 69-1 at 1.) On this Regular Grievance, Riddick wrote:

> C/O K. Moore was at my celldoor to get me for my psychiatric physical that she about 20 minutes prior had refused, she yelled through the side of my celldoor, put your shit in the box and strip bitch & called me a pussy. She put leg irons tightly around my shins & didn't adjust them. She yelled in my ear & called me a bitch as Nurse Craft was getting my blood pressure & she pressed down on my shoulders forcefully & called me a nigger after my psych. physical. She told me to make a move, while I was [restrained] & while … Shirks was removing leg irons from my shins. Moore said I was scared to come out of my cell because I'm a bitch & pussy.

(Docket Item No. 69-1 at 1.) This Regular Grievance was dated October 9, 2019, by Riddick.  Riddick testified that he did not mention saving the video in this Regular Grievance because the Informal Complaint response told him the video had been

saved. J. Messer signed this Regular Grievance and noted that it was received on October 11, 2019.

The Level I Response to this Regular Grievance also was admitted into evidence as part of Plaintiff's Exhibit No. 1. (Docket Item No. 69-1 at 3.) This Response stated:

> Grievance Summary: In your grievance, you state that on September 21, 2019, Officer Moore refused your psych physical and made several threats.
> Informal Summary: Sgt. Taylor responded to your informal complaint on October 4, 2019. Sgt Taylor responded that Officer [Moore] denies making these threats. Investigation [Unit Manager] Collins spoke with Officer Moore regarding your allegations. Officer Moore stated that she did not threaten you nor did she use inappropriate language towards you. [Unit Manager] Collins advised there was no evidence to support your allegations.
> Procedure/Practice: The Employee Code of Conduct governs the issue of cell searches.
> In accordance with the above information, this grievance is deemed UNFOUNDED, as procedures have been correctly applied. No further action appears to be necessary at this time.

(Docket Item No. 69-1 at 3.) This Response was signed and dated October 22, 2019. This signature is not legible to the court, but Riddick testified that it was signed by the Assistant Warden, S. Fuller.

Riddick appealed this Level I decision by writing:

> C/O K. Moore did what I stated in my complaint form & grievance. In the Warden Superintendants [sic] response, it stated C/O Taylor denied making threats. My complaint isn't about C/O Taylor. Video will show what C/O Moore did. View the video.

(Docket Item No. 69-1 at 3.) This appeal was dated October 24, 2019.

The Level II Response to Riddick's appeal, which was admitted into evidence as part of Plaintiff's Exhibit No. 1, stated:

> Your grievance appeal has been reviewed along with the response from the Level I respondent and your original complaint.
> Based on the information provided, I am upholding the decision of the Level I respondent, which had determined that your grievance is **unfounded**. I find no violation of policy.
> In accordance with Operating Procedure 866.1, Offender Grievance Procedure, this is your **last level** of appeal. You have exhausted all administrative remedies.

(Docket Item No. 69-1 at 4) (emphasis in original). The Regional Administrator's signature is not legible, and the Level II Response is dated November 8, 2019.

Riddick testified that, as a VDOC inmate, he never received any orientation or training as to how to request that video evidence be preserved. Riddick said he learned from other inmates that he could send a request that video evidence be preserved. Based on the advice of other inmates, Riddick testified, he sent a Request for Services form to the "intel officer" requesting that the video of the incident be saved. He said that he put the date and time of the incident on the request form. Riddick said that he never got any response to this request form.

Riddick testified that, in December 2021, he filed a request with the court to view the video of the September 21, 2019, incident. (Docket Item No. 32.) By Order entered on December 15, 2021, the court ordered the defendants to arrange for

Riddick to view the video recordings. (Docket Item No. 33.) In response, the defendants filed an Affidavit from Corrections Lieutenant C. Stanley, the Institutional Investigator at Red Onion, stating that the video had not been saved. (Docket Item No. 34-1.) In his Affidavit, Stanley stated that the Investigator's Office received no request from Riddick to retain the video of the alleged incident with Moore. Stanley also stated that, if the Investigator's Office had been notified of the use of force on an inmate, staff would have downloaded and saved the video. Stanley also stated that an inmate could request video be saved in a grievance, but he said the Investigator's Office received nothing from the Grievance Office indicating that any video should be retained regarding Riddick's claims.

Riddick testified that he first learned the video had not been saved by reading Stanley's Affidavit. Riddick stated that, at one point, Moore had claimed that she had used force on Riddick because he had refused to kneel. If this were true, Riddick said, VDOC policy would have required Moore to file an incident report regarding her use of force.

Riddick said that the surveillance video should have captured Moore's use of force on him. Without the video evidence, he said, it was just his word against Moore's word. Riddick said that video would have shown whether Moore used force on him, the amount of force she used and that he did not refuse to kneel as Moore had claimed at one point. Riddick said, even though the surveillance video cameras did not record sound, a video of this incident would show Moore pressing her mouth to Riddick's ear when she called him a bitch during his psychiatric examination.

Riddick testified that the defendants should have known that he was going to file a lawsuit over this incident because he fully exhausted his administrative

remedies. He also testified that, as of the date of the hearing, he had 10 lawsuits pending in this court. Riddick said that he thought he had filed only one other lawsuit while at Red Onion before filing this case. Riddick stated that he knew, as a prisoner, he was required to fully exhaust his administrative remedies before filing suit. Riddick said that, prior to this incident in 2019, he had filed dozens of Informal Complaints and Regular Grievances. "I can't keep count. It's a lot," he said.

On cross-examination, Riddick stated that he was on his knees with his hands still restrained when Moore pushed down on his shoulders and then pushed him forward. He admitted that Moore and Shirks were standing behind him outside of his cell when this occurred and that he did not actually fall to the floor as a result of Moore's push. Riddick testified that Moore was standing behind him, but a part of her body was "off to the side of [his] shoulder." He said that Shirks was bent over removing his legs irons. With Moore and Shirks in these positions, he said, the surveillance camera across from his cell should have had a clear view of Moore bending over and pushing him forward.

Red Onion Correctional Sergeant Bradly Taylor testified that, as a Correctional Sergeant, he did not have authority to log into the Max Pro camera system to review and/or download and save surveillance video recordings. Taylor said that, if he needed to view surveillance video, he had someone who had authority to access the system, such as a Correctional Lieutenant, a Captain, a Unit Manager or an Intelligence Officer, to log into the system and pull up the applicable video for his review. Taylor testified that he was the person who responded to Riddick's Informal Complaint No. ROSP-19-INF-01891.

Taylor said that he had no current recollection of reviewing the video evidence in this matter. Based on his response to the Informal Complaint, Taylor said he had someone pull up the applicable surveillance video, he reviewed it and saw no use of force in the incident. Taylor said that he had to have reviewed the video recording with another person who was authorized to access the Max Pro camera system, but he did not remember who accessed the system for him. He said he then provided the written response to Informal Complaint No. ROSP-19-INF-01891. Taylor said that he believed that he asked that the video be downloaded and saved, because he wrote on the form, "Appropriate video has been saved." Taylor admitted that, because he could not remember who the person was who allowed him access to the Max Pro camera system to review the video, he could not say whether that person had authority to download and save a video recording from the system. Nonetheless, he said the person who allowed him access to the video recording could have requested that a person with authority download and save the video. He said that, after he reviewed the video, he assumed it had been saved. Taylor further admitted that he believed the incident Riddick described would have been captured by the surveillance video if it had occurred.

Taylor testified that, if, after reviewing the video evidence, he had found any merit to Riddick's claim of a use of force by Moore, he would have completed an Internal Incident Report, and an Incident Report for the use of force would have been completed and submitted. Taylor testified that the C2 Housing Unit where Riddick was housed on September 21, 2019, had a total of four surveillance cameras, two of which were located on the wall opposite all of the cells, pointed in the direction of the cells. Taylor stated that, if Riddick was kneeling down at his cell door with two officers behind him, these two officers would have been between the surveillance cameras and Riddick. Taylor said that any time a prisoner is moved out of his cell in

a restrictive housing unit, he must be accompanied by at least two officers. Taylor also testified that the cell door opening was no more than three feet wide and eight feet high.

Taylor testified that there was no VDOC policy which required him to make a log entry or record of the date and time on which he reviewed video surveillance recordings. Taylor also testified that VDOC policy did not require him to save video evidence if it did not show a use of force. Taylor said that he requested the video in Riddick's case be saved in case Riddick continued to assert that force had been used on him.

Red Onion Unit Manager, Larry Collins, testified that, as a VDOC prison Unit Manager, he had the authority to access the Max Pro camera system to pull up and review surveillance video recordings. Collins said, as Unit Manager, he was the head prison staff member in the C Building. Collins stated that, in his role as a Unit Manager, he reviews surveillance video recording several times a week. At one point, Collins said that he did not have the authority to download and save video recordings, but he had the authority to instruct the Intel Department to download and save video recordings. At another point, Collins admitted that he had the authority to download and save video recordings, but he said that he did not do so because he did not have the capacity on his work computer to save video recordings. Instead, he would have the Intel Department download and save video recordings because the Intel Department had dedicated hard drives used to store saved video recordings.

Collins said that he vaguely remembered Riddick's allegations against Moore. He said that, in preparation for testifying, he looked to see if there were any reports drafted regarding the alleged incident, and he found none. Collins said that, since no

reports were submitted, "[i]t would indicate to me that nothing happened." (Docket Item No. 80 at 68.) Collins said that he could not remember specifically, but there was a good possibility that he reviewed the video recordings at issue in this case with Sgt. Taylor. Collins said that there were no records of whether he or any other staff member watched the video recording at issue in Riddick's allegations. Collins said he did believe that the computer system likely contained some type of record of who logged in to watch video recordings on a particular date and time. Collins also testified that he could not recall whether he or any other staff member ever told Sgt. Taylor that the video evidence had been saved. Collins said that he knew that he did not download and save the video at issue in this case because he had never downloaded and saved any video recordings. He said that, if he had needed the video saved, he would have asked an intelligence officer to do so. Collins specifically denied that he took any action in any way to delete or destroy any video recording of the incident at issue.

Collins testified that the computer system which contained the surveillance video recordings contained only so much storage space. After a certain period of time, a period Collins did not know, the system would record over or overwrite previous surveillance video recordings. Because of this, Collins said, he knew it was important to download and save a particular video recording if it might need to be reviewed later. Collins said that he had no idea whether the computer system created a record of when a video recording was recorded over.

Collins said that he could not recall interviewing Moore about Riddick's allegations. Nonetheless, he said that he had completed an internal form for the Grievance Department on October 17, 2019, which indicated that he had spoken with Moore, and Moore had denied making any threats or using any inappropriate

language toward Riddick.[2] He said, based on his conversation with Moore, he found no merit to Riddick's allegations.

Collins testified that, if he reviewed video footage that revealed that a correctional officer had used force on an inmate, he would, first, get medical to check on the inmate. He then would ask that the video recording of the incident be saved, and he would make sure that reports were written about the incident. Collins testified that he did not ask Moore about any alleged use of force on Riddick because Riddick's Regular Grievance did not complain of any use of force. Upon review of the Regular Grievance, which was contained in Plaintiff's Exhibit No. 1, Collins admitted that it did reference Moore putting the leg irons on tightly and pressing down on Riddick's shoulders forcefully. Collins, however, testified that he did not consider this an allegation of a use of excessive force against Riddick.

Collins further testified that each Regular Grievance was supposed to contain only one issue. He admitted, however, that it was the Grievance Coordinator's job to review inmate grievances, and it was the Grievance Coordinator's job to reject a grievance if it contained more than one issue. He further admitted that, once an inmate grievance is accepted, it would be his job to respond to whatever allegations were raised in the grievance.

Collins testified that it would have been difficult for the surveillance video to show what had occurred regarding Riddick's allegations, if there were two officers standing behind him at the time of the incident. Despite Sgt. Taylor's testimony,

---

[2] This form was not admitted into evidence at the hearing, but it was attached to Assistant Warden Shannon Fuller's Affidavit submitted in opposition to the Motion. (Docket Item No. 49-3 at 8.)

Collins said there were actually five surveillance cameras in the C2 Housing Unit. Collins agreed that there were two cameras on the wall opposite the cells. Collins said that the "rear" camera on this wall would have the best view of Riddick's cell. He also said that, if the cell door was open, and the camera's view was unobstructed, its recording could probably show some of Riddick's cell's entry area.

Corrections Captain, Christopher Gilbert, testified that, in September 2019, he was a Corrections Lieutenant serving as the Institutional Investigator at Red Onion. Gilbert said that he had no recollection of ever being asked to look at any use of force by Moore against Riddick on September 21, 2019. He also said that he did not recall ever looking at any surveillance video footage of the incident. He said that based on a review of his files, there was no investigative file ever opened about that allegation. He said that indicated to him that he had not been made aware of the incident, and that no video evidence of the incident had been saved. He said that he also does not recall ever being told the video was or was not saved. He also stated that he did not keep any record of the date and time he reviewed certain surveillance videos.

Gilbert testified that Intelligence Officers, Investigators, Corrections Lieutenants, Captains, Majors, the Assistant Warden and Warden, as well as electronics and maintenance, had the ability to log into the system and view surveillance camera recordings. Gilbert said that he did not know if everyone who could access the system had the authority to download and save video recordings. Regardless of who may have the authority to do so, Gilbert said, the procedure at Red Onion for saving surveillance video recordings was to request the Institutional Investigator do so. Gilbert said that he did not keep a log of every video recording he reviewed. Gilbert admitted that he was the only Institutional Investigator at Red

-13-

Onion in October 2019, but there were three Intelligence Officers who worked in the office with him at the time. He said that himself and the three Intelligence Officers all had the ability to download and save surveillance video recordings. These Intelligence Officers were James Bentley, K. Counts and R. Murphy, he said.

Gilbert said that he could be asked to save video by an email or personal request. He also said that, if he was notified of an incident, he would go back and save the footage of the incident. He said that inmates could request that video recordings be saved by submitting a request form. Gilbert said that he had no recollection of Riddick ever submitting a request form asking that the video recording of his cell during the September 21, 2019, incident be saved. Gilbert said that he reviewed his files and did not find any such request form from Riddick. He said that an inmate also could request a video recording be saved by making a request on his administrative remedies forms. He also said that he did not recall if anyone ever verbally asked him to save this video.

Gilbert said that any video recording that is not downloaded and saved is eventually "overwritten." He said that it was a matter of computer storage capacity, explaining that once the computer reached its storage capacity, older video recordings are overwritten by the newer video recordings. He said this is done automatically by the computer system. Gilbert said, as a former Institutional Investigator, he knew that the only way to save a video recording of a certain incident was to download it and save to a separate computer file on a separate computer hard drive. Gilbert said that it was possible that the recording of the C2 Housing Unit on September 21, 2019, was still available for viewing on the date of the Level II Response to Riddick's Regular Grievance, on November 8, 2019.

Gilbert testified that, at some point, he was made aware that Riddick had requested the video, and the court had ordered that it be produced. He said he then went back to see if the video had been saved or was available, and he could not find it. Based on this, Gilbert said, he believed that the video had never been saved. Gilbert specifically testified that he took no action to delete the video at issue.

Defendant Jeffrey Kiser testified that he was the Warden at Red Onion on September 21, 2019, but he had, subsequently, retired. As Warden, Kiser stated, he had authority to access the Max Pro surveillance camera system to review recordings. Kiser said that, in September 2019, Correctional Lieutenants, Captains, Majors, Duty Officers, Intel Officers, Investigators and Electronics Techs, all, had access to the surveillance camera recordings. While he also had authority to save recordings, Kiser stated that he typically used the Intel Officers and the Investigators to save any needed video recording. Kiser said, as Warden, he routinely would review video recording of any "major incidents," such as a claim of use of excessive force, any use of force or cell entries. He estimated that, as Warden, he reviewed video recordings at least weekly.

Kiser testified that he had received some instructional training on how to use the Max Pro surveillance camera system, but he had never been shown, and did not know, how to delete or record over video footage.  Kiser specifically testified that he did not personally delete or record over any video recordings. Kiser said that he never reviewed any video recording regarding the September 21, 2019, incident involved in Riddick's claims. Kiser testified that the Max Pro surveillance video recordings did not record any sound.

Kiser testified that Assistant Warden Fuller responded to Riddick's Regular Grievance concerning the September 21, 2019, incident between Riddick and Moore. Kiser said he did not review this Grievance until just prior to trial. Kiser said that, under the VDOC Grievance Policy, he had the authority to designate the Assistant Warden to respond to Level I grievances. Kiser admitted that one way an inmate could request that video of an incident be saved is to ask that the video recording be reviewed on the Informal Complaint, which he admitted Riddick did in this case. Kiser further admitted that, based on the documents before Fuller, he should have known of the importance of the video recording of the alleged incident. Kiser also admitted that he did not know if Fuller had reviewed the video recording or not before he responded to Riddick's Regular Grievance. Kiser stated, however, that, if Fuller had looked at the video recording, he should have ordered someone to save it. Kiser said that, insofar as Fuller responded to Riddick's Regular Grievance, he was doing so as if Kiser, himself, had made the response. Kiser admitted he was responsible for whatever knowledge Fuller had and the actions and inactions Fuller took or failed to take based on that knowledge. Kiser admitted that he did not speak to Fuller regarding his decisions on Level I grievance responses other than Fuller would notify him if any grievance was founded.

Kiser testified that Fuller's Level I Response grievance summary addressed only Riddick's allegations that Moore refused his psychiatric physical and made threats toward him. Kiser said that these were not the type of allegations that would prompt him or Fuller to review video recordings. Kiser also said that, if a Regular Grievance contained more than one issue, the Grievance Coordinator would reject the Grievance at intake. Kiser said that there was no VDOC policy that required him to keep a record of the date and time of every video recording he reviewed. Kiser admitted that he wished the video had been saved, but he would not say that, based

on the allegations contained in Riddick's Regular Grievance, the video should have been saved. Kiser also admitted that he knew that Riddick was a "frequent filer of grievances." Kiser also stated that, as Warden, he knew that any time an inmate filed a grievance, there was a good possibility that someone might get sued over the allegations. He said he knew how important it was to preserve evidence that proved or disproved an inmate's claims.

Wesley Graham, an Electronics Tech at Red Onion, testified that he had been asked if he could determine who had viewed any video recording of the September 21, 2019, incident at issue in this case. Graham said that he was unable to determine who had reviewed the recording because the electronic records associated with the C Building video recordings only went back to March of 2020. He said that he did not know why there were no records before this date. Graham said that he does have the ability to access the video surveillance system to determine who accesses the system and when. He said, however, when he attempted to do so regarding this case, there were no records prior to March of 2020.

Graham testified that, around September 21, 2019, Red Onion was experiencing problems with its video surveillance system throughout the prison. Graham said that Red Onion was the first VDOC facility to convert to the Max Pro system. "I would say, [it was] tested on us, I guess you might say. So there was a lot of bugs to iron out, so to speak," he said.  Graham said that the prison has used the Max Pro system since some time in mid to late 2016.

Graham said the Max Pro surveillance system currently was set to retain video recordings for 90 days. He said, early on, the system did not have enough storage capacity to retain 90 days of recording, but it did have that capacity now. Graham

said that, if a video recording is not downloaded and saved, the system records over it automatically after 90 days. Graham said that the system does not keep any record of when new video records over older video recordings. Graham testified that he did not actually check the system to see if the video recordings taken on September 21, 2019, still existed on the system because he did not normally perform that task and because he knew that video from that date would not exist on the system.

Graham testified that SD memory cards could be inserted into the Max Pro cameras so that each camera could store video recordings, but he said that was not how the system operated at Red Onion. He said that the Max Pro system at Red Onion stored recorded video on computer servers located in each building.

Graham testified that, as an Electronics Tech, he was not involved in downloading or saving any video recordings regarding incidents. He said that he had never been asked to delete any video recording from the prison's system, and he had never deleted any video recording from the system. He said that he had never trained anyone at Red Onion to delete any video recordings from the system.

## II. Analysis

Federal Rules of Civil Procedure Rule 37(e) controls when sanctions may be imposed for a failure to preserve electronically stored information. *See Jenkins v. Woody,* 2017 WL 362475, at *12 (E.D. Va. Jan. 21, 2017); *In re: Ethicon, Inc.*, 2016 WL 5869448, at *2 (S.D. W.Va. Oct. 6, 2016). Rule 37(e) states:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a

party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

(1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

(A) presume that the lost information was unfavorable to the party;

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter a default judgment.

FED. R. CIV. P. 37(e). Thus, a number of requirements must be met before the court may sanction a party over the loss of electronically stored information. First, there must be a showing that the electronically stored information should have been preserved in the anticipation or conduct of litigation. Second, there must be a showing that the party who possessed the information failed to take reasonable steps to preserve the information. Third, the information must be lost and cannot be restored or replaced through additional discovery. If these requirements are met, and the moving party can show prejudice from the loss of the information, the court may order measures "no greater than necessary to cure the prejudice." FED. R. CIV. P. 37(e)(1); *see Muhammad v. Mathena*, 2016 WL 8116155, at *8-9 (W.D. Va. Dec. 12, 2016). The most severe penalties, an unfavorable inference instruction or default judgment, may be entered only upon a finding that the party who failed to preserve the information "acted with the intent to deprive another party of the information's use in the litigation." FED. R. CIV. P. 37(e)(2); *see Muhammad*, 2016 WL 8116155 at *8.

Based on the evidence before the court, I find that the court should order measures in this case to cure the prejudice caused to Riddick by the failure to

preserve this video evidence. At the evidentiary hearing, defense counsel conceded that the lost video recording was electronically stored information that should have been preserved in anticipation of litigation, but it was not because a party failed to take reasonable steps to preserve it. The defense further conceded that this video evidence cannot be restored or replaced through additional discovery.

I further find that the evidence before the court establishes that Riddick has been prejudiced by the loss of this video evidence. The defense concedes that this video evidence was relevant to Riddick's claim. In fact, the evidence before the court showed that this video evidence was reviewed and cited by prison officials in the denial of Riddick's Informal Complaint and Regular Grievance complaining of Moore's alleged use of force. Therefore, the evidence before the court establishes that the video must have provided evidence of what happened in this incident. Because this video evidence was not properly preserved, the court, and, ultimately, the jury in this case, will never know exactly what the video recordings showed.

I do not find, however, that the evidence before the court establishes that the video evidence was lost because a party acted with the intent to deprive another party of the information's use in the litigation. The evidence before the court showed that Warden Kiser is the only defendant in this case who had access to Red Onion's Max Pro surveillance video recordings at the time that the recording should have been saved. Warden Kiser specifically denied that he ever viewed this video or took any steps or instructed anyone to take any steps to delete this video evidence. The evidence before the court also showed that Moore, as a Correctional Officer, did not have access to the Max Pro surveillance camera system to view, download or delete any video recordings. There is no evidence before the court that the other defendants – Mullins and Manis – had any access to the system.

Based on the above, I find the following measures are necessary to cure the prejudice to Riddick by the loss of this evidence:

1.  Any evidence that the video recording of this incident showed that Moore did not use force on Riddick on September 21, 2019, may not be admitted at the summary judgment stage or at trial; and

2.  Evidence that the video evidence should have been saved for Riddick's use, but was not, may be considered by the court and admitted into evidence at trial.

It is so **ORDERED**.

The Clerk's Office shall provide a copy of this Memorandum Order to all counsel of record and unrepresented parties.

**ENTERED:**  March 28, 2023.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE